On The Right Track Systems, Inc. With regard to Virginia law, I direct Your Honor's attention to pages 31 to 33 of my brief, in which I cite specific Virginia authority that states that under Virginia law, the sole member does not devolve into the LLC upon dissolution. And there was a case almost on point, the Farmville case. A sole member of an LLC sought to assume the contractual rights of the LLC, and the court said, no, you can't. Contractual rights do not devolve upon you. Under Virginia law, a member of the LLC is distinct from the LLC itself, and under Virginia law, a limited liability company does not devolve into a sole member upon dissolution. Under Virginia law, the dissolved LLC and not its members individually is the proper party to bring a breach of contract case. And under Virginia law, the dissolved LLC vindicates its contractual rights as part of the winding up of its affairs. So the premise of your, hypothetically, Your Honor, is incorrect. With regard to the anti-assignment clause, the final sentence, any attempted assignment in contravention of the foregoing shall be void and of no force or effect. And I look at the inurement clause, which is also paragraph 11.1, this agreement is binding upon and inures to the benefit of the parties and their permitted, permitted successors and assigns. So, yes, the contract would supersede any so-called operation of law. I will point out that the complaint is utterly devoid of any explanation of how Jennifer Whitaker, by operation of law, succeeded to the rights of curtain cuts. What law? How did it operate? The complaint says not one word about that. That would be a question of law, though, right? You wouldn't expect that. It's not even in his brief. It's not even in his brief. Right, but just to separate out that point, I understand your argument that the law does not support that contention, but there would be no reason to have to make a legal argument in a complaint, right? Well, what he's saying is, she's a third-party beneficiary, she's a successor, she's an assign. Now, if she's a third-party beneficiary, she can't be a successor or assign, because she's already part of the contractual paradigm. If she's a successor, then she can't be an assign, because if she succeeded by operation of law, you didn't need an assign. I understand these are alternative arguments. Yeah, but how did it – but they're just labels. They're just labels. How did she become a third-party beneficiary? There's nothing in the complaint that quotes any contractual language showing a clear intent for these two contracting corporations to benefit her directly. There's nothing in – there's no language quoted in the complaints showing that on the right track is going to pay royalties directly to her and that only she could sue to collect minimum royalties. There's nothing in the agreement that permits that, and therefore the complaint doesn't quote it. How did she become a successor? He just says by operation of law. Well, you've got to have a plausible theory. So I want to go back to the hypothetical and ask you – I'm going to change the fact a little bit and ask you what your client would and should – how it should deal with this. Assume that the patent is a profitable one. It's profitable to exploit it. The LLC is dissolved, as this one was, and the property, the ownership of the LLC goes to the owner of the LLC, including the patent. She sells the patent to somebody else who then somebody else licenses it to somebody, to some third person, fourth person, which would be in derogation of your rights to the exclusive exploitation. What do you do? You consume the LLC, but the LLC doesn't exist and it has nothing. Its property is gone, the patent is gone, the patent has been sold by plaintiff here to another person. So tell me what steps does your client do to recover the exclusive right to exploit the patent? Your Honor, I don't believe that could ever happen because in the Patent and Trademark Office, not only is the patent registered, but also any assignment of the patent must be filed in the Patent and Trademark Office. And here – and this Court can take judicial notice of this – the assignment from Jennifer Whitaker to Curtain Cuts was filed in the Patent and Trademark Office. The subsequent reversion of that patent to her upon the dissolution of Curtain Cuts was never recorded in the Patent and Trademark Office. So if someone down the road, represented by counsel, now takes this patent, that third party now has a claim of legal malpractice against his counsel. I thought the patent was licensed to you. You just said assigned. No, no. Was it assigned to your client or licensed? No, Jennifer Whitaker was the inventor. As the inventor, she assigned her patent to Curtain Cuts. And then Curtain Cuts entered into the license agreement. Right. But the assignment from Jennifer Whitaker to Curtain Cuts was registered – the first thing I looked at when I took the case – was registered in the Patent and Trademark Office. I also want to correct something. License to you was not registered. Correct. That is correct. Mr. Burns stated that from day one, on the right track, paid royalties to Jennifer Whitaker. That is absolutely not true. And we refuted that during the motion practice. And if your honors look at pages 87 to 88 of the record, you'll see the check register. You're getting away from answering my question. Okay. All you said was it would never happen. But my hypothetical is it did happen. Okay. So what does your client do? Well, you actually made life for my client much easier. Because now you have this third-party licensee making all sorts of money with the patent. And now on the right track walks up and says, hey, I'm the exclusive licensee. You are infringing my patent rights. And not only do I have a claim for damages, I can get my legal fees. So this is wonderful. I would love for that to have happened. Probably the infringer, you're saying. Yes. So you're an infringer. The infringer would then bring Jennifer Whitaker back in and say, hey, wait a minute. You defrauded us because you didn't tell us about this license agreement and this Dipsy Doodle you did about dissolving curtain cuts and then forming a new company and signing to the new company and then having that new company licensed to somebody else. She wants to run a business that way. Okay. But the bottom line is she never had a contract with on the right track to receive minimum royalties. Thank you very much. Obviously you've had a lot more time to make up a bit for the time given to Mr. Burns. Go ahead, Mr. Burns. Thank you, Your Honor. We are not asking you to rewrite the contract, but what's interesting is they have to explain why they paid 7% royalties to Jennifer Whitaker. And I think we have a bit of the argument that they did it because they accepted that there was an assignment of the right to receive royalty payments. They say no, that in fact there was this separate oral contract between on the right tracks and Whitaker. Sir, can I just ask you? I'm sorry. To go back to the question we were asking opposing counsel, the question of whether Ms. Whitaker is the successor to the LLC and whether if she is the successor she, by operation of law, inherits all of its contractual rights, is that a, let me ask you this first. What law governs that question? Is it Virginia law? No, New York law. Okay, and why is that? Because the contract has a provision in there discussing that successors or assignees are permitted under certain circumstances. So you're saying that because the contract says that New York law governs the question of assignability, it's New York law, and the contract says New York law governs, you're saying it's a question of New York law who succeeds or who doesn't? Yes, with respect to rights, including the right to assert claims for royalties, yes. So is it your view then that the entire case turns on our interpretation, on the contract claim, turns on our interpretation of 11.1, and whether we read that as saying that a successor automatically exceeds to all of the rights under the contract, or if we were to agree with your opponent that 11.1 requires certain approvals for a successor to inherit, are you saying then the question under New York law is how we read 11.1? With respect to both successors and assignees. Yeah, just let's stay with successors for the moment. Your view is that 11.1 governs the question of whether your client could acquire the rights under the contract as successor, putting aside your alternatives. Yes, that comes into play, yes. Well, hang on, comes into play, I'm asking whether you believe that 11.1 governs that question. That plus cases interpreting similar provisions, but yes, that's the order of the contract. Sure. Yeah, that's all I'm saying. That's all I'm saying, yes. Going back to Judge Nardini's question, wouldn't New York law look to Virginia law for the interpretation of what happened with respect to the rights of the various parties upon the dissolution of the LLC? Well, Virginia law would cover questions regarding the dissolution of the LLC, whether it could be revised. Yes, Virginia law would cover that issue, but I don't think that question is really at play as opposed to our argument that she, under the contract, is a successor or assignee of the right to receive royalty payments. Now, it's your view, Mr. Burns, that New York law applies to, say, the unjust enrichment and quantum baroque claims, is that right? Yes, that would appeal to New York law as well. And why is that? Well, the contract was in New York, the defendant is New York. Does the contract itself say that? The contract itself says that as well, yes. Where in the appendix do I find it? Is that page 825? Page 825, applicable law is page 825, Your Honor. Including with regard to the principles of conflicts of law, which gets to Judge LaValle's question, right? So, your point is that New York conflicts law would point to Virginia in some circumstances. Well, just respect to the disillusion of the Virginia LLC. But you're saying that because 16.1 says New York law applies without regard to its principles of conflicts of law, that the only law governing this is the substantive law of New York in terms of who can succeed or be an assignee of this contract. That the parties have opted out of whatever Virginia laws might otherwise have come into play. That you've put yourself exclusively in the hands of New York law without cross-references. That's correct. Okay. Just one minor point. Again, they said that there was a separate... To explain why they paid Whitaker, they say, we're trying to rewrite the contract. But in fact, they say there's a separate oral contract between On the Right Tracks and Whitaker for the payment of just the 7% royalties. Well, where does that come from? That's just out of thin air, as opposed to payment of both the 7% royalties and the minimum royalties. So, their whole theory is that there's this oral agreement which explains why they paid the 7%. But apparently, they claim they get to dictate that that's the only provision. And they disregard the obligation to pay the minimum royalties. I'd just like to leave that point for later on. Thank you very much. Thank you. We'll reserve this then. Thank you very much. Thank you. We'll turn now to David Impalazzeri v. State of New York, 21 May, 2018. Good afternoon, Your Honor. Mr. Cohen. Yes, Your Honor. Thank you for allowing my client to have me appear remotely. And may it please the Court, counsel. I'm going to begin by a discussion regarding whether or not the plaintiff's appealant in this case suffers an injury that is causable. That is, an injury worth being considered by a court under Title VII plaintiff. In our brief, we go to some lengths in describing a sprint case. This is one of the leading stories that comes to people a lot. The question in this case, and I know you're familiar with the fact, is that Mr. David Impalazzeri, a nurse, male nurse in the female-dominated profession, had an arbitration. And following the arbitration, it had been cleared of the allegations of domestic violence. And the arbitrator ordered that he be allowed to return to work. When that order had come about, he also was back paid. He had been out of work for nearly a year. He was neither back paid in a timely fashion, nor did they properly handle the notion of a concentration position as a return to work. What they did instead was that they contacted him via a phone message. He responded by contacting his then-counselor, who contacted the employer to arrange the time for him to return to work. The plan was that he would return to work as soon as he could give notice to his employer that he had any interest. Because being out of work for a year, unpaid, he needed to work in another nursing position. When he did this, they refused to speak to that counselor. Instead, during deposition, he was knocked off the board. Meanwhile, without ever even speaking to Mr. Malazaro, they wrote a letter. A letter that was drafted in so much stress and vitriol that the person who wrote the letter at deposition admitted the letter was extremely harsh, and that she had gone through her computer gears as to whether or not the letter should even be sent, and was advised, yes, that's what we're doing. Regardless of that letter, it advised Mr. Malazaro that henceforth, he would be working a shift that was essentially a graveyard shift. It's our argument that under Title VII, that graveyard shift changed the terms and conditions of his employment, and is, in fact, a causable injury. It's true that a mere shift change is not normally considered sufficient of an injury to justify a Title VII claim. I'll grant you that. However, every case is factually specific. Even the cases that were out of the other way always were based back to that case. Here, Mr. and Pat Malazaro was a nurse in great priority with a really flawless record prior to these allegations. And as such, he was entitled to priority in picking the more favorable justice. Actually, counsel, the statute of limitations issue seems to loom large here. My understanding of the facts is that your client was demoted from a grade, whatever the number was, 18, outside the limitations period. So he can't sue over that unless you have a continuing violation theory. But let's assume for the moment he does not. And he had been demoted to a grade where he did not have any say in the time or location of his shift. Do you agree with that? I do not. The second part of it I disagree with. The demotion didn't include his priority with regards to the time of his shift. That had no effect on that whatsoever. But what I wanted to instead focus on is Title VII. Actually, I'd like you to focus on the question I just asked because it strikes me as potentially determinative. And I'm not quite – I understand your point. Are you saying that he was not demoted beyond the limitations period? Whether you're demoted from grade 18 to grade 16, either way, you would still maintain the right to control as to the shifts you would work and the location. That would not change. Remember, he had been a grade 16 for some years and had been enjoying all those privileges of seniority. Right, and he doesn't have that anymore because he's been demoted and now he's on probation. So now we have someone who's within probation within the limitations period, right? So how is the shift change now an adverse employment action with respect to him? I think the court misapprehended the issue of the probationary period. Yeah, please. Let me explain. The gentleman was a grade 16 employee who was not in any way on probation of any sort. He had control over his shift and had preference under the rules of his employment. Then received a promotion to grade 18. During the period of that promotion, he is probationary in that position. What happened was, without any claim of misconduct of any kind, he had been moving forward and about to graduate from that probationary period on grade 18. But the employer, once the allegations that were raised came up, they realized that he would become a permanent grade 18 almost instantaneously. And therefore, decided that they were going to put him at the MoGov. We can't really complain of that, and that's not even really touching the heart of my lawsuit. I complain on that degrading. In other words, normally you have a right to reduce his rank from grade 18 to 16. It's not a problem during that period of probation. And it's not even actionable. So, good reason, bad reason, no reason at all. However, you can't do it for a discriminatory reason. And here we claim they gave him the demotion precisely because of his sexual harassment. I know, but I thought the point is the demotion happened outside the limitations period. No. When did the demotion happen? When did the demotion happen? Eleven months before, but that's not what I'm saying. Can you tell me the date on which the demotion happened? I believe it was in July, I believe July 22nd, 2015. And that's at page 151. Am I looking at the right page, at page 151? I think so, yes. But let me explain. Keep in mind that there was also acts which affected his sentiment in June and July of 2015, which we claim were violations of his due process rights. However, interestingly, Mr. Palazzari was never told that there had been a departure from the policy of receivers for investigating and claiming sexual harassment, nor was he even told to charge for sexual harassment during that period of time. The claim that he's known to claim did not include the conduct concerning the failure to advise him of the sexual harassment claim and fighting against the claim to be substantiated in July of 2015. They're claiming that, well, why isn't that sooner? Finally, I guess. And their rights have to be outside the period. However, it was only in 2018 that Mr. Palazzari, during the course of this litigation, even learned that the Office of Diversity and Inclusion had conducted an investigation of the sexual harassment claim, excluding him from an interview, which is required under the policies and procedures, without ever advising him that there was an investigation under way, without ever advising him that in July they had determined the claim was substantiated, without ever giving him a cause for the decision to appeal it in-house as he was permitted to do under the policies and procedures. And he didn't even obtain the copies of the papers regarding that investigation, or the facts concerning it, until 2018. Well, he's the one to talk. So the argument that you should have included scrutiny before he asked in your original claim and should have filed it sooner under DOT, in this case, was an impossibility for Mr. Palazzari. At this point, all he knew is that he got a promotion and it seems though the lawyer had the right to do that. So he didn't bring him immediately for that. It was only when he got the whole picture that he understood that indeed, that they were engaging in an act of discrimination from the moment the claim was filed. And it was only then that he filed the DOC complaint, leaving out many of the claims of which he was still unaware. Now, he did, however, talk in terms of having a progressive act. And indeed, the complaint itself, at least page 6, paragraph 35, makes that as well. And our point was that it would be fundamentally unfair to say that you have an untimely claim because you didn't include certain acts against me, which I didn't even know of until well into the discovery of this case. Keep in mind that it took us literally years to even get the internal memo between all of the administrators that showed the multiple acts of discrimination against Mr. Smith. For instance, the complaint Mr. Smith had made an accusation against numerous supervisors, all females except one male. And with regard to those allegations, there was a DOC complaint given to the hospital, naming Mr. Calidari along with a list of all the other supervisors. Interestingly, we never saw that DOC complaint. And it was never served on him. And it was never provided to him until this lawsuit, 12-18-19. And our point is, again, they treated him differently than the females did. With regard to the female employees, they documented throughout that the complainant, his companion, spoke lies about them. And yet, and they fought aggressively against the claim made by this person they viewed as not credible with regard to every female employee. With regard to every male employee, they provided no defense. They didn't even advise him. Left him in the complete dark that there was a claim of sexual harassment. When this claim arose in June, they simply said to him, don't show up for work. Why? We're not at liberty to tell you. Now, meanwhile, they were conducting an investigation in violation of their own provision for investigating sexual harassment claims. And our expert on this issue, Ida Castro, the former head of the DOC in the United States of America, and the director of the policy that must be followed for sexual harassment claims, has produced affidavits and testimony that, indeed, they violated their own policy, the procedures and policies of the DOC. Mr. Koch. Hey, but you didn't even pull them back from your original complaint. Hold on one second. We've given you some additional time, of course, and we're happy to have had it. But I want to ask a somewhat simplistic question. You have sprayed, you have made a lot of different claims. At bottom, it seems to me, your greatest, your strongest claims are the lack of fairness in the proceedings in various respects. So tell me what you think is the appropriate decretal language, the appropriate decree of this court. Obviously, you want to remand to the district court. But what is it that you think the district court should consider on remand? They should consider, and never was considered, that one of the policies and procedures that has been talked about, that there was, that they treated the claims differently than the females, the females reported, in that, one, no interview of retaliatory took place until, in the Office of Diversity and Inclusion, until the claim was already determined to be substantiated. What claims, what do you think are the strongest claims for you to be able to pursue on remand? Due process. Which cuts across all of the claims, is that it? Yes, and beyond due process, I would be arguing very aggressively that they treated him, on the basis of this, different from every other person this woman accused. Keep in mind, the woman who made these accusations left this facility, went to the hospital practically next door, was fired within months for bringing false accusations against her supervisor. She had a long history, even before Mr. Impelazare met this woman. On the first week of her appointment, she had committed three different acts of insubordination, including vulgar language, and was warned, you will be fired if this continues. And none of that was shared with Mr. Impelazare, as he understood the case was trivial. He saw her only five times. That's the first school, that's the first four or five visits there was a meeting with the supervisor. She had no complaints against him at all. But then, the very next time he worked with her, he pointed out that she was taking medication. And her attitude was, oh, so what? And he said, oh, so what? People die from that. And then, within hours of that, she was grafting a set of complaints against him. And then he was fired, he was fired within three weeks. A list of accusations against him were absolutely, it's almost impossible to believe that a person as awful as him could possibly have worked at that hospital with a school record for so many years. Seven years without complaints. And now, all of a sudden, he's the most awful person ever. He reminds us that if we were truly to teach others this, I would deserve it. Thanks very much. Thank you. May it please the court, Beasley Kiernan for the defendants. The district court properly granted summary judgment on Plaintiff's discrimination, retaliation, and due process claims. As to the discrimination claim, as Your Honor noted, nearly all the alleged events occurred outside the limitations period. The only two events that occurred within the period were not adverse to Plaintiff. First, after the arbitrator reinstated Plaintiff, he was assigned to the night shift on what was supposed to be his first day back at work. Plaintiff was a float pool nurse. This meant that he could be assigned to any floor at any time. And he was assigned to the night shift on April 18, 2016, because that's where he was needed. And indeed, Plaintiff even acknowledged in his deposition that he could be reassigned shortly thereafter. Since there are so many different claims, I want to just, for my own benefit, try to understand what you might be agreeable to. Is it fair to say that the Plaintiff's Title VII discrimination claim is a strong one which could survive? No, Your Honor. And why is that? Again, the only two alleged adverse actions during the limitations period were not adverse. Plaintiff argues that the earlier actions could be brought in under hostile work environment theory. He fails to make out a hostile work environment claim, principally because he fails to introduce sufficient evidence suggesting that any of the actions were motivated by discriminatory anibus. He argues that he was treated differently than other hospital employees who were also accused of misconduct by Ms. Compagny. But those hospital employees were not comparable to Plaintiff. Plaintiff was accused of sexual harassment by Ms. Compagny. The other hospital employees were accused of retaliating against Ms. Compagny for making those allegations against Plaintiff. Those allegations are not equally serious, so the fact that the hospital employees were treated differently does not suffice to support an inference of discrimination here. And what about the Title VII retaliation claim? Again, no adverse actions within the limitations period. Plaintiff also fails to allege that he engaged in any protected activity. He points only to the filing of his grievance in September 2015, but the filing of a union grievance standing alone does not constitute protected activity under Title VII unless the grievance complains about discrimination. And the grievance here at page 171 of the deferred appendix clearly shows that Plaintiff is only challenging the notice of discipline. He's not alleging any discrimination at that point. Nor is there sufficient evidence that defendants took any adverse action against him because of this September 2015 grievance. And what exactly do we have on page 171 of the appendix? I believe that's... Or do you draw our attention? Just the fact that the grievance itself does not mention discrimination. It challenges only the notice of discipline under the collective bargaining agreement. No, Your Honor. No, Your Honor. But this is the only... It's the only alleged protected activity that Plaintiff even points to. And even this is not protected activity for Title VII purposes. And you're saying that in any event, there was no adverse employment action? That's correct, Your Honor. Again, the only actions within the limitations period were the assignment to the night shift, which at most was a near inconvenience to Plaintiff, and the written letter from Defendant Brackett stating that Plaintiff's failure to show up could be cause for discipline. That was just a letter warning. It did not impose any discipline in and of itself, so it was not an adverse action against Plaintiff. And could you just address the due process claim? It's my understanding that your argument is sort of twofold, or maybe more than that. But one, that the Plaintiff failed to identify in the complaint any particular involvement by particular individuals in identifying who purportedly was involved in whatever due process violation, and that these arguments regarding Thompson were not presented to the District Court or were raised for the first time in appeal. Did I characterize your argument correctly? That's the first argument. The District Court ruled on those grounds. I think the easiest way to approach the due process argument is that the only alleged deprivation of any protected property interest was the suspension without pay. That was in September of 2015. That suspension comported with due process because Plaintiff had an adequate post-suspension remedy in the form of the arbitration, and indeed the arbitrator agreed with Plaintiff that the hospital had lacked probable cause to suspend him without pay. The arbitrator ordered back pay, which has now been paid, I understand. And it was not clearly established that Plaintiff was entitled to any pre-suspension process. To the contrary, the Supreme Court in Gilbert v. Homer held that an adequate post-suspension remedy was sufficient. Let me follow up on the matter of the procedural regularity or lack of it in these various matters. It's your position that I take it that the Court held that the Plaintiff could not show, correct me if I'm wrong, the Plaintiff could not show a trial that Upstate had created a hostile work environment. Is that right? Yes. Are you sure about that? The record seems to have lots of examples of what we would regard as abusive procedures or lack of procedures. The record lacks any evidence that Plaintiff was subject to intimidation or ridicule or insults while he was working. During this period from July 2015 until he resigned in May 2016, he wasn't even working at the hospital. He was subject to a number of procedural steps in connection with the investigation. But there's also insufficient evidence to suggest that the hospital undertook those actions on the basis of sex. Again, his only argument is he was treated worse than other hospital employees. And those other hospital employees were not comparable for the reasons that I noted earlier. So you're saying that it's not enough to show hostility in the work environment. It has to be attributable to a protected interest under Title VII. Yes, Your Honor. It has to be a hostile work environment on the basis of sex. And the District Judge also held that the Plaintiff could not show a trial that upstate engaged in one or more adverse employment actions against Plaintiff after January 12, 2016, right? That's correct. Is that possible? How could he not show it? What suggests that he couldn't show this trial? The only actions he points to are his assignment to the night shift on April 18, and then the written letter that the defendant Brackett sent to him a few days later because he failed to show up for that shift. The assignment to the night shift could not have altered the terms and conditions of his employment because, again, he was a float pool nurse. He could be assigned to any floor at any time. My understanding is that the argument would have been different, perhaps, if he had been demoted within the limitations period. It could have shown that he had a legitimate or a cognizable complaint about his demotion that took away his purported right to preference about shift location and shift time. But that all happened outside the limitation period, so now he's in a position within the limitations period where he has effectively no meaningful say over his shift. And then when he gets the night shift, that's not an adverse action with respect to his status within the limitations period. That's right, Your Honor. What about his termination? His proposed termination? His suspension and proposed termination, I suppose, could have constituted an adverse action if it were within the limitations period. What about his ultimate termination when he was told that he didn't show up and therefore you're terminated? He was not formally terminated and nothing ever came of his failure to show up because he resigned on May 4th, just a few days after he received that letter from defendant Brackett. Didn't the letter say he would be terminated? I believe it said he could be subject to discipline, yes, for not showing up to work, of course. It listed a number of possible consequences, but you're saying that he resigned before there was any determination of what those consequences might have been. That's right, Your Honor. They didn't necessarily, you're saying they had not committed to, for example, saying you're fired. He might have been, I don't know, docked pay or something. Right, this is a civil service employee. To terminate a civil service employee, there's a process that has to come before you can actually do that. And he predetermined that by just resigning. Yes. And he had secured employment elsewhere. Yes, so he was not going to come back at this point because he had another job anyway. It seems to me that he, at trial, he could probably show, tell me why this is not accurate. My hunch is that he could show at trial that the defendants, Barber, Feeney, and Thompson, were personally involved in the alleged due process violation. Is that not true? I'm not saying that it's accurate, that that's a factual determination. But that he would have enough evidence to go to trial on the question of whether Barber, Feeney, and Thompson had been involved in the allegations of due process violations. Again, it's outside the limitations period. Is that it? The due process claim, there's no limitations problem. The problem with the due process claim is that the only alleged deprivation of any property interest is the suspension without pay. And your honor is correct, that those individuals were involved in that determination. But Plaintiff received sufficient process after that suspension. He also received notice of the charges against him and an opportunity to be heard at the August 2015 interrogation. So tell us what that post, that later process that he received, which cured, in your view, the earlier arguable deprivation of due process. The Supreme Court held in Gilbert v. Homer that a post-suspension hearing sufficed, particularly where the employer had a significant interest in immediately suspending the employee. The hospital here had such an interest. The hospital found that Plaintiff's presence posed a danger to others at the hospital. It could have caused significant interruption, disturbance. That's why he was suspended without pay. Why don't you describe that for me, that procedure after he was terminated. The arbitration itself? Is that what your honor? Is that the only remedy he had? To challenge his suspension without pay? It was certainly an adequate remedy in that he prevailed at the arbitration. On due process questions, when was there an opportunity to have that reviewed for the lack of due process? I don't understand, but what I'm failing to understand is why summary judgment would be appropriate on the due process claim. Summary judgment is appropriate because the only alleged deprivation of property was the suspension without pay in September 2015. And he had an adequate remedy in the arbitration, and indeed prevailed at the arbitration. Are you saying in addition to that, that he did receive due process before the suspension without pay, and he did receive notice and a hearing? In addition, he received notice of the charges against him and an opportunity to respond to those charges at the August 2015 interrogation. Was that prior to the suspension without pay? That was prior to the suspension without pay. So you're saying that there was no process violation, however harsh the result was. There was no problem with process. No, there was no due process problem. Was there prior to the suspension without pay? Or even if there had been, it was remedied by the subsequent entanglement to the hearing that could and did remedy it? That's right, your honor. And going back before the suspension, it's true that Plaintiff was failed on probation, but he had no protected property interest in his grade 18 level because he was on probation. It's also true that he was placed on administrative leave, but that was leave with pay, and this court has held that paid leave does not constitute a deprivation of any protected property interest. And can I just ask, I see the reference in your brief to page A302 for the proposition that at the summary judgment stage, and I think that's what we're talking about here is the summary judgment papers before the district court, that the Plaintiff did not identify any particular individuals with respect to individual actions that would give rise to due process, or is this somehow narrower? It's the quote on page 302, that there was a concerted effort by the various state defendants to deprive the Plaintiff of notice of the accusations being made against him and to deny him due process. Was there another part of the summary judgment papers where the Plaintiff, and I'll ask that question too, where the Plaintiff purported to identify particular actions by particular individuals with respect to the due process argument? I'm not sure, Your Honor, whether Plaintiff was more specific in other places. I think the district court looked at this and said, there's just not enough here to show the defendant's personal involvement. I think the easier way to go about this is just to say, the only alleged deprivation of a protected property interest was the suspension without pay. And intuitively that was a deprivation of a property interest, but it purported that due process. Plaintiff focuses on the hospital's noncompliance with its own internal investigative policy. That policy, that investigation was subsumed by the disciplinary process under the collective bargaining agreement. And of course the collective bargaining agreement controlled the hospital, complied with that. Anything that happened beforehand could not possibly have violated due process because he was on paid leave. So the arbitrator, in your view, had the ability to review all of the allegations of violations of due process under Upstate's own regulations? The Upstate's own regulations weren't really an issue in the arbitration. Right. So therefore it didn't cure, it could not have cured, the arbitration procedure could not have cured any defect in any procedural due process defects under the rules of Upstate. That's right. To the extent that your honors hold that being placed on paid leave could be a violation of due process in this instance, and again that's contrary to the court's case law, it's true that the arbitrator's decision didn't address that point. Mr. Cote, you're up and maybe you could... Yes, let's address a couple of factual issues. One question that counsel seems to suggest is that once he was demoted from grade 18 to grade 16, he bought all of his entitlement to a shift preference. That's not true. He had been at grade 16 with shift preference for years by that point. Could you tell us where in the record, counsel, give us a page in the record that says after he was demoted, he still had shift preference? I don't have a specific page, but the depositions that were part of the record of his supervisor, I believe it was Farber, and also the nurse administrator, both of whom testified he was absolutely entitled to those services, just by reason of his years of service. And by the way, the state said he was a float nurse. He was a float nurse to grade 18 nurse. The second he was reduced, he was no longer a float nurse. He was a float nurse. He was being assigned to a floor he had never worked on before without any training concerning that floor, without any update on any changes... I understand the facts, but if you could just point us to where in the record there's any indication that he was entitled not to be assigned to such a floor where he didn't have experience, etc. And you've directed us, I think, to the depositions of Supervisor Farber and a nurse administrator? Yeah, I believe a bracket testified concerning the senior story issue. I believe it's doc number 152, page 94, and I believe also page... And page what? I'm looking at... I didn't make this question, I apologize, Your Honor. 152 of the appendix, is that right? I think he said document. I think he said document 152, page 94. Bracket number 154-26, and it's page 94 of the bracket deposition. Are these in the appendix, or are these simply in the docket somewhere? I believe they were among the papers submitted to the lower court. So we may need to dig for these. Would you do us a favor? I don't know what the... Yes, go ahead. With the presenter's indulgence, would you perhaps be able to file something by... close of business tomorrow with the citations to places in the record that support your contention that even post demotion, your client still had some entitlement, I suppose, to shift preferences? I may not be saying that the right way. When I asked the question, Bracket admitted that those bad shifts, or night shifts, were, quote, to lack senior nurses, a different kind. All right, could you just do that, though? Yes. File that by close of business tomorrow, and I suppose, could we ask the opposing counsel if they have contrary citations, or citations to pages that are contrary to that position, you can submit those. And if they're not in the appendix, if they're not in the appendix, give us the materials as well. Yes, Your Honor, I will definitely do that. I'll give the specific agency, no problem. We're dealing with the difference between the so-called record and the appendix. So it may be, as you say, that there are materials that you're relying on in the record, but they're not before us because they're not part of the appendix. So as Judge LaValle pointed out, we would be grateful for copies of the pages from the record which do not appear in the appendix. Yes, Your Honor. Go ahead. The next thing I want to address is whether or not he was motivated on account of that. I want to point out during the 17-minute interview that took place in August, that interview, it was the first time Mr. Calabari was even alerted to the claim on sexual harassment. And there is two drafts, and I know this is complicated. Draft number one is investigation of sexual harassment claims, and draft number two is arbitration concerning discharge. Draft number one is where most of the acts of discrimination took place because that's where he was kept in the dark that it was an investigation, kept in the dark that it was a decision. When did he get notice of the investigation? 2018. No, no, no. During the chronology. As I understood your argument in your papers, he showed up for a hearing, or some sort of meeting. He showed up in August for a 17-minute questioning, which he was brought to a jail, a police station, sat at a table with armed guards nearby, as if he was the most dangerous man around. Armed guards? And then they, at the same time, pronged on him the idea of why would a young nurse accuse you of this? That taught me that indeed there was a gender-specific motivation to rush to judgment that he was guilty. And that was the first time you heard about this? Correct, and that was after, almost a month after, Thompson had already substantiated his claim of sexual harassment, had already issued a written decision that he advised their policy and procedures were plausible to share with him, and that he had 10 days within which to appeal that. And he hadn't had notice of any of that? None. He was kept completely in the dark. Every time he got asked, they said, I'm not at liberty to tell you, and at the deposition, I asked them about that. I asked each of those nurses involved in administration, and they said I was just doing what I was told and not telling them. I asked, and I tell them, and the answer was always no, you can't. I don't understand your contention that it follows that this was on account of sex, on account of gender, simply because he was being accused of sexual harassment of a nurse. I mean, if he's being accused of misconduct, it's on account of the misconduct. The fact that it's sexual harassment, sexual harassment can be done by male or female. The fact that one is accused of sexual harassment doesn't mean that the accusation is on account of one's gender. Here, we have the internal email between all of the various administrators and supervisors. In it, they said, we've had enough of this kind of conduct. And before there had even been an investigation, we're coming up with punishments for him, like let's promote him immediately, let's get a ruling from... I'm sorry, counsel, I don't see how these are responsive to Judge LaValle's question. You're talking about punishments, and maybe they prejudged him. Let's assume they did. I think the question on the table is, why is there a basis in the record to think that any of this was on account of sex or on account of gender? Of his being a male. Of his being a male. It's not normally admitted by people who are doing these things. Hey, I'm doing this on account of your sex. But we do know this. They treated all of the women she abused, with no investigation at all. But isn't their point, isn't their response that she accused them of different things? Well, she accused them of, among other things, endangering patients. She accused them... Right. Different things. Different things. That's true, but one of them, for instance, was you are supporting Mr. Malazari, and you're trying to cover up sexual harassment. Isn't that sexual harassment in and of itself? If you're engaged in the conduct of covering up sexual harassment, isn't that sexual harassment? That's of what they were accused. There was no investigation at all. None. They immediately denied it when the EEOC made the file, but they didn't even... But to go back to... Hold on a second. Hold it. Hold it. Hold it. Hold it. Hold it. To go back to Judge LaValle's inquiry and Judge Nardini's, was he found guilty of sexual harassment? No, he was not. He was mentioned clear that that's not true. He was found guilty of it, though, in-house. He was entitled to an appellate process, which he was never given. In-house. And that was by Thompson in July 2015. But it seems to me that you are using the words sex and sexual in two different ways and confusing them. The fact that one is involved in some kind of a controversy about sexual harassment doesn't mean that an inquiry into whether you are guilty of that and a finding that you are guilty of it is on account of your gender. The issue of on account of sex has to be involved... It depends on whether the motivation for the adverse finding was the gender of the person being accused. The fact that the subject matter of the accusation is about sexual misconduct of some kind, such as sexual harassment, doesn't mean that a finding that you are guilty of it is on account of your own gender. Well, let me put it this way. Here, I agree with you, Your Honor, that that's an interesting point you made. But it's not, yes, that they did sexual harassment. What I'm saying is that women who were also accused of sexual harassment got entirely different treatment. Judge Nardini pointed out, as counsel had said, that they were accused of other things, and they were less serious things. I disagree that it's less serious, I guess, because if you are accused of covering up sexual harassment and helping to harass her, doesn't that make you guilty of sexual harassment? I don't know how that... Well, the question is whether, as a matter of law, that must be true. They have to be similarly situated. So I suppose we could argue, until the cows come home, that if three people are accused of three different things, and one is punished and two are not, I suppose you could try to make the argument, well, those other two things are even worse than the sexual harassment that was punished. But once you agree that they are not, in fact, the same thing, I don't see how you can say that they are similarly situated. Well, it's going to be very hard to come up with identical situations between men and women, because, first of all, there are few men in a woman-dominated profession. But what we do have here, the remarkable fact here, is that the women in the female situation who accused him, also accused many female employees of what I believe to be sexual harassment, for which there was no investigation at all, including conduct that touched on sexual harassment, because the counsel found out, isn't that more serious than sexual harassment? Remember, sexual harassment here, the whole thing he supposedly did was to discuss his personal life about an alleged affair, or at least that's what he claimed he did, and to talk about the term masturbation, not that he talked about her, like he was saying, I want to do this in front of you. In fact, it was very clear that there was no sexual aggression towards this woman, simply that he engaged in inappropriate conversation. Isn't the act of punishing her, giving her a horrible assignment and mistreating her because she had made those accusations, worse than even what he accused Mr. Impella of? Because I say they are worse. I mean, they have a different title, but I would say that if you're acting to retaliate against a person claiming sexual harassment, that is at least as bad, in this case, even worse than what Mr. Impella values. Thank you very much, Mr. Coates. You've gone on all too long, but we appreciate the argument very much. We'll reserve the decision, and we are adjourned. Thank you, Congressman. Thank you.